

# NUMBER 13-23-00556-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JACOB BROWNSON,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

## ON APPEAL FROM THE 175TH DISTRICT COURT
## OF BEXAR COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Fonseca**
**Memorandum Opinion by Justice Silva**

Appellant Jacob Brownson appeals his capital murder conviction, for which he was sentenced to life imprisonment without the possibility of parole. *See* TEX. PENAL CODE §§ 12.31(b)(2), 19.03(a)(7)(A). By three issues, which we renumber, Brownson contends: (1) the evidence corroborating accomplice-witness and jailhouse-informant testimony was insufficient; (2) the trial court abused its discretion in admitting a redacted excerpt

from a letter Brownson wrote in jail; and (3) his Sixth Amendment right to counsel was violated when the trial court admitted, and the State emphasized, his jail letter. We affirm.

## I. BACKGROUND[1]

On the morning of September 27, 2016, members of the San Antonio Police Department (SAPD) were dispatched to La Paloma Apartments after the property manager noticed a person laying on the floor near the patio door of an apartment. Upon arrival, law enforcement confirmed there were three deceased individuals in the apartment suffering from multiple gunshot wounds identified as Anthony Rodrigues, Pedro Garcia, and Matthew Martinez. Following an investigation by SAPD, Brownson was subsequently arrested for capital murder. *See id.* § 19.03(a)(7)(A).

### A. Procedural History

Brownson was indicted for the above-referenced offense on March 9, 2017. *See id.* The indictment alleged that on September 27, 2016, Brownson intentionally and knowingly caused the deaths of Rodrigues, Garcia, and Martinez by shooting them with a firearm. It further specified that "the three murders were committed during the same criminal transaction." A five-day jury trial commenced on November 6, 2023. We summarize the relevant evidence below.

### B. Lay Witness Testimony

#### 1. Cynthia Bush

Cynthia Bush testified that she was the property manager at La Paloma

---

[1] This case is before the Court on transfer from the Fourth Court of Appeals pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). We are bound by the precedent of the transferring court to the extent that it differs from our own. *See* TEX. R. APP. P. 41.3.

Apartments in 2016. She confirmed that she called 911 on September 27, 2016, because she noticed "an individual was laying on the floor by the patio door" of apartment K3. Bush further testified that she did not enter the apartment, but she "could see [through] the patio door." She also testified that she "saw another body" but "couldn't identify who it was." After calling police, Bush and her assistant waited for police to arrive at the apartment.

### 2. Rolanda Rodriguez-Waton

Rolanda Rodriguez-Waton confirmed that she was living at La Paloma Apartments in 2016. On September 27, 2016, Rodriguez-Waton was returning home from walking her son to school around 7:10 or 7:20 a.m. when she "heard some noises" before entering her apartment. She described the noises as "boards falling, one on top of the other." Rodriguez-Waton further testified that when she got to her apartment, the door would not open, and she recalled hearing gunshots during this time. Once she was able to open her apartment door, Rodriguez-Waton noticed a man wearing "a sweater with the hoody on top[ and] blue jeans" "went out of [an] apartment through the sliding window towards the front of the office." She further noted that the sweater was "light in color" and the man came from the "apartment where the sounds or noises were coming from." Rodriguez-Waton further testified that around 3:40 p.m. the same day, she saw "one person laying in front of the sliding window."

### 3. Andrea Pina

Andrea Pina testified that she lived at La Paloma Apartments in apartment K13 in 2016. She further testified that on September 27, 2016, she heard "around seven" gunshots at 7:15 a.m. On cross-examination, Pina clarified she possibly heard three to four gunshots rather than seven.

3

### 4.    Kristin Seiffert

Kristin Seiffert testified that she knew Rodrigues, Garcia, and Martinez and "stayed with them for about a month" at La Paloma Apartments. She also testified that her friend Kenzie Marlow "stayed with us." Seiffert explained that she "was seeing [Rodrigues], and [she] was friends with [Garcia] and [Martinez]." Seiffert testified that she met Brownson because of Garcia and the two "seemed to be really close friends." She also met Brownson's wife Rebecca Brownson "one time in passing" and another time at a party held on the Saturday night before the murders occurred. Seiffert recalled that Rebecca "had three children with her" during the party. After reviewing photographs previously admitted into evidence, Seiffert testified that the group was celebrating Garcia's birthday. She also confirmed the photographs depicted a birthday banner, "the front door of the apartment," and "the sliding door on the side that connected to the back patio." Seiffert testified that she, Marlow, Rodrigues, Garcia, Martinez, Brownson, Rebecca, and the Brownsons' three children were all in attendance at the party and that people were drinking alcohol there.

Seiffert testified that Brownson left the party at some point "to go get McDonald's for his kids" around "12:30 in the morning" and she did not see him again that night. She mentioned Brownson "didn't have a personal cell phone, but he asked to borrow [Garcia]'s cell phone." She further testified that Rodrigues was upset the following morning because she and Marlow slept in Rodrigues's bed and Rebecca slept in Garcia's bed with the children. Seiffert stated that Marlow "and [Rodrigues] started arguing, and then [Marlow] said it's time for us to leave. So we got our stuff and left." When asked if she ever went back to the apartment, she responded, "No." Seiffert also testified that Brownson called

4

her cell phone "around noon" on Sunday and wanted to speak to Rebecca but Seiffert told him that she and Marlow were not at the apartment. On cross-examination, Seiffert confirmed she was not at the apartment on Tuesday morning and she and Marlow never went back to the apartment after they left on Sunday.

### 5.     Kenzie Marlow

Marlow testified that she met Rodrigues, Garcia, and Martinez through Seiffert and that she and Seiffert ended up living with them at La Paloma Apartments for about a month. Marlow confirmed there was a birthday celebration for Garcia. She testified that she met Brownson "within a week of [Garcia]'s birthday" and that she later met Rebecca. She stated the Brownsons had three children "under five." Marlow testified that people were drinking alcohol at Garcia's birthday celebration on a Saturday night. Marlow confirmed that, at one point during the party, she was smoking a cigarette outside in a breezeway and that Rodrigues and Brownson were physically fighting. She provided an in-court identification of Brownson. Marlow noted that as a result of the fight, Rodrigues ended up with a cut to his head and "he was bleeding pretty bad." She agreed that the evening became hostile after the fight. Marlow testified that "[a]round 11:00 or 12:00 at night," Brownson stated "he was going to McDonald's." She further testified that Brownson "took [Garcia]'s phone to use" and Rebecca "was using [hers] and [Seiffert]'s phone[s]." On Sunday morning, Marlow and Seiffert left the apartment and did not return. Marlow testified that Brownson eventually called her or Seiffert "and asked if [w]e were still at the apartment." She also stated that while at the apartment, Rebecca was "[j]ust taking care of her kids really." Marlow identified Rodrigues, Garcia, and Martinez from photographs previously admitted into evidence.

5

### 6. Rebecca Brownson

Rebecca provided an in-court identification of Brownson and testified that she had three children with him. She further testified that she was given "immunity in exchange for being a witness for the State." On the weekend preceding September 27, 2016, Rebecca traveled from Kerrville to San Antonio with Brownson and their children. Rebecca testified that she went to Garcia's apartment for Brownson's birthday and that Garcia "wanted to meet [their] youngest child." She stated Garcia and Brownson "were very close." Rebecca confirmed they were going to the apartment to enjoy the evening and originally were not planning to stay overnight or for several days. She explained there was a party going on at the apartment on Saturday night and they stayed. Rebecca testified that during this party, Brownson "was supposed to go get food for the kids" from McDonald's in Rebecca's van while she stayed at the apartment "[t]aking care of the children." She recalled seeing Seiffert and Marlow at the apartment but they left at some point during the weekend. According to Rebecca, Brownson did not return to the apartment until Tuesday morning, the date of the murders. Rebecca testified that she called Brownson on Tuesday morning and told him "to come get us and [that] the kids are out of food, the baby is out of diapers, and [Martinez] had money that he was going to lend him." Shortly after this phone call, Brownson finally returned to the apartment.

Rebecca recalled that morning Rodrigues, Garcia, and Martinez were in the living room and Martinez and Garcia were getting ready for work. She proceeded to put her children and personal items in her van when she noticed that she left the cover to her child's rocker in the apartment. After Brownson offered to retrieve the cover, Rebecca stated he was gone for about "two or three minutes" and then they left "to a gas station

6

right down the road." Rebecca testified that they drove to the house of their friend Jay after leaving the gas station.[2] According to Rebecca, Brownson destroyed Garcia's and Martinez's cell phones during the ride to Jay's house, "threw them out the window," and told her "that he killed everybody." The following exchange occurred:

| | |
|---|---|
| [The State]: | Once you got to Jay's house and you go inside, do you have a conversation with [Brownson] and . . . in Jay's presence? |
| [Rebecca]: | Yes. |
| [The State]: | What does—I guess where does this conversation take place in Jay's house? |
| [Rebecca]: | Like where the kitchen/eating area was. |
| [The State]: | And what does [Brownson] say in that conversation? |
| [Rebecca]: | Do you want me to say word for word, or? |
| [The State]: | Yes. |
| [Rebecca]: | He said that he had gone back to talk to [Martinez] and [Garcia] and [Rodrigues] because he thought one of them had drugged my drink and done something to me, and when he got there they weren't—they were too busy trying to get ready for work since they were running late and they weren't giving him the attention that he felt like he deserved. |
| [The State]: | Okay. So, he says that he doesn't feel like he's getting the attention he deserves? |
| [Rebecca]: | Right. |
| [The State]: | What happens next? Or what does he say happens next? |

---

[2] Rebecca clarified that Jay's name was Romo but his nickname was Jay.

7

| [Rebecca]: | He pulled out his gun and [Martinez] said, "You won't like—you won't do it," and challenged him. And so he shot [Martinez]. |
| --- | --- |
| [The State]: | Okay. Did he describe how he shot [Martinez] or just that he shot [Martinez]? |
| [Rebecca]: | Just that he shot him. |
| [The State]: | Okay. What did he say happened next? |
| [Rebecca]: | [Garcia] realized what he did and tried to run out so he shot [Garcia], and he didn't die right away so he shot him again. |
| [The State]: | Okay. And then what did he say happened next? |
| [Rebecca]: | [Rodrigues] had been sleeping and he woke up mad at the noise and was saying something about how it echoed in there and looked around and saw what was going on and so [Brownson] shot [Rodrigues], too. |
| [The State]: | And after [Brownson] tells you and Jay what he did, what happens next? |
| [Rebecca]: | We stayed at Jay's house. |

Rebecca testified that following this exchange she washed Brownson's clothing and that he "sold [the gun] back to Jay." She reiterated that the reason Brownson wanted to confront Rodrigues, Garcia, and Martinez is because she "had woken up sick . . . [a]nd he thought that someone had maybe put something in [her] drink or something and . . . sexually assault[ed her]." Rebecca also stated that "after we left Jay's house [Brownson] kept pointing a gun to [her] head and told [her that she] was a loose end, and [she] was scared."

SAPD Lieutenant Rachel Barnes questioned Rebecca on October 12, 2016, and

8

November 29, 2016. Rebecca testified that she reached out to Barnes again after these two interviews because she

> hadn't been truthful with [Barnes] during the first two interviews. Because [Brownson], before he went to jail, he had told [her] if [she] ever told anyone what he did that he would kill [her] or have somebody kill [her]. And then as more time passed[, she] just wanted to do the right thing.

Rebecca then identified Rodrigues, Garcia, and Martinez from photographs previously admitted into evidence. She also confirmed Brownson's handwriting appeared on a jail letter shown to her by the State. A redacted version of this jail letter was later admitted into evidence outside the jury's presence and discussed by Barnes in her testimony.

The State proceeded to question Rebecca concerning video surveillance footage from a gas station nearby the scene of the shooting previously admitted into evidence.[3] Rebecca identified Brownson in the video footage as the individual at the counter of the gas station around 7:02 a.m. on September 27, 2016. She further testified that he was wearing "[a] white shirt and a gray hoody underneath with [blue] jeans and white shoes" and confirmed her van was "parked by a gas pump facing the store." On cross-examination, Rebecca clarified that Brownson sold the gun to Jay after he held it to her head and "on the way to the funerals."

### 7.    Patrick DeBravo

Patrick DeBravo testified that he was incarcerated in the Bexar County Jail on November 10, 2016. In December, DeBravo was transferred to a cell with Brownson for

---

[3] Prior to this discussion, Nizar Kiyani testified that he was managing the Quick Stuff gas station in San Antonio on the corner of San Pedro and Rampart. He further testified that the gas station was equipped with approximately sixteen video surveillance cameras. During this time, Kiyani stated that he was contacted by SAPD to locate certain video footage from the morning of September 27, 2016. He further confirmed that he provided copies of the video surveillance footage to SAPD, which were located on a flash drive and admitted into evidence.

9

"[a] few weeks." DeBravo provided an in-court identification of Brownson. He further testified that one night, Brownson started telling him "a story about a guy named [Martinez] was haunting him, and [he] had no idea what [Brownson] was talking about. And . . . [Brownson] started going into more detail about it." DeBravo stated that Brownson told him "that he had killed some people." He further testified that Brownson stated, "Dude, when I shot [Martinez], I made eye contact with him, and . . . [Martinez] still haunts me [until] this day." DeBravo confirmed he had never previously met Brownson or Rebecca. He stated that Brownson "start[ed] telling [him] about these three individuals that [Brownson] shot, and at one point [Brownson] mention[ed] the name [Rodrigues]." DeBravo was able to write Brownson's statements on pieces of paper he stored in his bible. The following exchange occurred:

| [The State]: | Where did [Brownson] tell you that this murder took place? |
| --- | --- |
| [DeBravo]: | At the La Paloma Apartments. |
| . . . . | |
| [The State]: | Okay. And who is it that [Brownson] said that he killed? |
| [DeBravo]: | [Rodrigues, Martinez, and Garcia]. |
| . . . . | |
| | Basically he told me that he was somewhere in San Antonio and he had gotten a call from his then wife Rebecca saying that she thinks that the three deceased had put . . . some type of like Xanax or something in her drink and they had ran a train on her and she woke up sore. So she called [Brownson] and he sa[id] that— |
| [The State]: | Just—I know. It's court, we all know. So what did |

10

|  |  |
|---|---|
|  | you interpret "ran a train" meant? |
| [DeBravo]: | Well, that the three individuals had, you know, put Xanax in her drink and they took advantage of her while she was unconscious . . . and had sex with her without her permission. |
| [The State]: | Okay. And then what did he tell you he did? |
| [DeBravo]: | He told me that he advised her to lock herself in the . . . master bedroom of the apartment and their children were there, that he was going to come over there and handle the situation. And so [Brownson drove] himself over there in the van. |
| | . . . . |
| [The State]: | Okay. And then . . . what did he do when he got there? |
| [DeBravo]: | [Brownson] told me that he went inside and got Rebecca, they came back outside. He told her to get into the driver's seat of the van, that he was going to go back inside and get the kids. And his plan was to, you know, remove them from the environment and then he was going to kill them while they were in their sleep. So [Brownson] goes— |
| [The State]: | So what did [Brownson] say happened when he got there? |
| [DeBravo]: | Well, when [Brownson] got there, he got Rebecca out. She went to the driver's seat. He went back in two or three times, I think there was three children, and got all the kids out. And then the last thing that he was going to do was get the . . . baby bouncer. And when he went inside to get the baby bouncer, that [Martinez] had woken up. And somewhere in between then he had taken [Martinez]'s phone and g[ave] it to Rebecca without [Martinez] knowing. So when he went back inside [Martinez] was awake, and that changed everything for [Brownson] |

11

because he said that he didn't plan on anybody being awake, that he was supposed to do it while they were asleep.

. . . .

So when [Martinez] approached him about the phone[,] . . . he pulled out the gun and pointed it at him and said, "Man, I'm not here to talk about the phone, I'm here to talk about what you did with my wife," and [Martinez] like stood up . . . and told [Brownson], "Man, if you're going to . . . pull out a gun, I mean, you're going to have to fucking kill me." Before he could even say the word "kill me," that's when [Brownson] shot him.

[The State]: Okay. And where did [Brownson] say he shot him?

[DeBravo]: [Brownson] said he shot him first in the neck area—or the face and it came out of his neck. And then he shot him in the chest area, and that's when [Martinez] fell and landed on top of his legs and started making the gurgling sounds.

. . . .

And then after that happened . . . [Garcia] tried to run. Well, [Brownson] was in the front of the door, I guess, so . . . [Garcia] tries to run by and . . . [Brownson] shoots him three times and [Garcia] falls against the door and starts saying, "[Brownson], why? [Brownson], why?" And that's when [Rodrigues] wakes up and [Rodrigues] tells him, "Man, [Brownson], what are you doing? You're being too loud. We got to live here," or something like that and—

[The State]: So what happens after that?

[DeBravo]: Then [Brownson] described to me the look of horror on [Rodrigues]'s face as he realizes that [Brownson] has a gun and . . . [Garcia] was still alive, but . . . [Martinez] was deceased. And

12

|  |  |
|---|---|
|  | that's when [Brownson] shot [Rodrigues] four times while he was wrapped in the blanket sleeping on the sofa, but he had, I guess, sat up and was talking to [Brownson] . . . and he shot him four times with the blanket wrapped around him. |
| [The State]: | What did he say that he did next? |
| [DeBravo]: | After that he said that he went and kneeled down by [Martinez] and tried to, like, grab his wallet because he knew that he had just gotten paid and had a thousand dollars in his wallet, but he had like a guilty thought, thinking that if— you know, since he was married—this is what [Brownson] told me. Since he's married, it's a righteous killing because of what they did to his wife, but if he [were] to steal the money and take [Martinez]'s gold necklace, that God wouldn't accept that. So he was, like, "I'm not going to take anything." And as he was exiting, [Garcia]'s still laying on the floor with . . . his head up . . . and has his arms out saying "[Brownson], why? [Brownson], why?" And he walked up to [Garcia] and shot him point blank in the head to . . . put him out of his misery, I guess. |
| [The State]: | Okay. So what did he say that [Martinez] was wearing? |
| . . . . |  |
| [DeBravo]: | A red wife beater. |
| [The State]: | Okay. And a wife beater would be a slang term for like a tank top? |
| [DeBravo]: | Yes, sir. |
| . . . . |  |
| [The State]: | Okay. So . . . .do you remember him telling you about [Garcia] having a hat? |
| [DeBravo]: | Just that he had . . . a hat on. |

13

| | |
|---|---|
| [The State]: | Okay. And then how did he describe what [Rodrigues] was wearing? |
| [DeBravo]: | He just said that [Rodrigues] . . . woke up from . . . being in a deep sleep and [Rodrigues] was wrapped up in a blanket sleeping on the couch. |
| [The State]: | Okay. And what did he say he did after he shot [Garcia]—I guess [Garcia] would have been the last shot. What did he do after he shot [Garcia]? How did he exit the apartment? |
| [DeBravo]: | He just said that he walked to the van that was waiting with Rebecca and his children in it and she drove off, and you couldn't see him in the passenger seat because he was leaning forward from whenever they exited the apartment complex. Excuse me. |
| . . . . | |
| [The State]: | Okay. And what kind of gun did [Brownson] tell you that he used? |
| [DeBravo]: | He said that he used a 9[-]millimeter and purposely put hollow tip—or hollow point bullets in it. |

DeBravo confirmed he met with Barnes and relayed all the information previously discussed.

## C.    Admission of Jail Letter

The State offered into evidence a redacted version of Brownson's jail letter previously mentioned during Rebecca's testimony, and the trial court held a bench conference regarding its admissibility outside the jury's presence.[4] During the hearing,

---

[4] As discussed later in Barnes's testimony, Brownson indicated in his letter that he invoked his right to counsel when speaking with law enforcement.

Brownson objected to the admission of the letter on multiple grounds including hearsay as well as his Fifth, Sixth, and Fourteenth Amendment rights. The following exchange occurred:

[Brownson's counsel]: We've reviewed this letter, Judge. We do not believe it meets the exception to the hearsay rule, specifically where it's an admission against interest under Rule 803(24). There's nothing in that letter where [Brownson] admits that he committed a crime.

. . . .

THE COURT: Okay. All right. Anything else?

[The State]: Just that all these arguments go to the weight of the letter and not its admissibility. And what somebody perceives to be an admission versus not an admission, that would be up to the jury to decide. And I would argue that his references to [DeBravo] most certainly are admissions in his plan or whatever he's cooking up or whatever the wording was, is an admission of guilt and an acknowledgement of guilt in an attempt to put the case on [DeBravo] and I guess quote, unquote, be gangster doing [so].

[Brownson's counsel]: We just want to add, Judge, the introduction of this letter under the current circumstances would violate [Brownson]'s right . . . to a fair trial under the Fourteenth Amendment and Fifth Amendment to the U.S. Constitution. Also, we argue that this letter would violate his right . . . to confrontation, the Sixth Amendment to the United States Constitution.

. . . .

THE COURT: Okay. All right. For the record, before we broke for lunch, I heard argument over the admission of the letter that came from the jail and the testimony that was given by the mailroom detention person and [Barnes]. After review of

15

the letter and the case law and based on your arguments, I am going to allow the letter to be admitted.

. . . .

[Brownson's counsel]: We do have one more issue because the part about talking to the lawyer [is] something that we anticipate will be left in?

THE COURT: So, I am fine with that portion being left in. That was—he made that admission. He shared that with a third party, so I believe it is admissible.

[Brownson's counsel]: Here's something for the Court, Your Honor, that I would like to share. It's a couple of cases.

THE COURT: Okay.

[Brownson's counsel]: They're very clear and succinct. And I will quote from . . . Sunday vs. The State, 9th Court of Appeals, 745 S.W.2d 436 at page 440, "More importantly, we can perceive only one message conveyed by the remark about hiring counsel, and that is that appellant's counsel must have made up the defense. Such remarks penalize the defendant for exercising his right to counsel" under the Sixth Amendment. Citing . . . U.S. v. McDonald, it's a 5th Circuit case, 620 F.2d at 564. Furthermore, such attacks on the integrity of defense counsel (indiscernible) improper that an instruction to the jury should disregard them may not be sufficient to cure the error.

. . . .

So, just the very brief reference to a lawyer being involved in this, Judge, which is highly incriminating.

THE COURT: Okay. Any response from the State?

[The State]: Again, just I—I disagree. I don't believe that his comment is—or his iteration of that comment is thus commenting on any of those issues, and it

16

|                     | puts the statement that [Brownson] made into context. |
|---------------------|-------------------------------------------------------|
| THE COURT:          | Okay. All right, I'm going to overrule the objection and I'm going to allow it. Anything else? |
| [Brownson's counsel]: | No. |

The trial court admitted Brownson's jail letter.

## D.    Law Enforcement Testimony

### 1.    Sandra Lopez

SAPD Detective Sandra Lopez worked as a patrol officer on September 27, 2016, when she was dispatched to La Paloma Apartments in reference to a "dead on arrival" call. Lopez testified that officers "observed three deceased bodies on the living room floor." She further testified that, after securing the area with crime scene tape, officers contacted a homicide detective. During Lopez's testimony, multiple photographs of the crime scene as it appeared on the day of the murders were admitted into evidence. Notably, the photographs depicted a "sliding glass door," an individual with bullet holes and a "blanket underneath" him, and spent shell casings. Lopez testified that "[o]nce the firearm is fired, the spent shell gets thrown out of the firearm" and the projectile is left on the ground.

### 2.    Eric Roberson

SAPD Crime Scene Investigator Eric Roberson arrived at apartment K3 on September 27, 2016. He testified that "[t]here were three deceased males in the living room." Roberson further testified that "[t]here [were] spent shell casings around each of the males, [and] hair and blood on the ground." He stated that there were "numerous

drinking cups, glasses, and bottles throughout the apartment." Roberson stated that after collecting items of evidence from the crime scene—including, among other things, a cigarette butt, a pink and yellow lighter, silver shell casings from a "Barnes 9-mm Luger +P," a spent bullet, pieces of a yellow and black t-shirt, a baseball cap, a "red-handled butterfly knife," alcoholic beverage containers, a cell phone "broken in three pieces," and apparent hair matter—he packaged the items of evidence and dropped them "off at the property room." The trial court admitted video footage of the crime scene and published it to the jury during Roberson's testimony. In addition, multiple spent shell casings and bullets collected at the scene and at the medical examiner's office were admitted as evidence and physically presented to the jury.

### 3. Ruben Resendez Jr.

Ruben Resendez Jr. testified that he was currently "the mailroom supervisor at the Bexar County Sheriff's Office" (BCSO). Resendez explained that "a mail trap is issued to an inmate by a[n] attorney or a detective, and . . . any incoming and outgoing mail that is received or sent by that inmate, other than legal mail, is photocopied and a copy is sent to that particular attorney or that particular investigator." Resendez further testified that he intercepted a letter written by Brownson during his incarceration at the BCSO addressed to Jennifer James. He recognized the letter as a redacted version of the same letter previously identified by Rebecca during her testimony.

### 4. Rachel Barnes

Barnes was one of the homicide detectives assigned to investigate the deaths of Rodrigues, Garcia, and Martinez. Barnes testified that she arrived at apartment K3 and observed "at least two deceased individuals" and "a lot of blood and shell casings." After

18

obtaining a search warrant, she further testified that "we entered the apartment and then we established that we had three individuals that were deceased." She described the apartment as being "messy, like there had been parties and things like that going on at the location." Barnes stated that "after talking to witnesses, we established that the murder actually occurred somewhere between probably 7:10 in the morning to 7:25 in the morning." During the course of her investigation, Barnes established "[t]here were three females who had been in and out of the apartment that were friends" and also that Brownson "had been in and out of the apartment along with his wife and three small children." Barnes provided an in-court identification of Brownson. She also confirmed she spoke with Rebecca and DeBravo on multiple occasions.

Based on photographs previously admitted as evidence, Barnes confirmed that at the time of the shootings, Rodrigues was laying on top of a blanket, Garcia had a hat underneath his arm, and Martinez was wearing a red tank top. She further noted that "9-millimeter hollow point" bullets produced the shell casings that were recovered from the crime scene. Barnes testified that she was familiar with the gas station video footage and that Brownson's clothing in the video was consistent with eyewitness testimony as well as DeBravo's statement. In addition, Barnes confirmed she put in a request for a "mail trap" on Brownson's jail mail and obtained his letter addressed to Jennifer James, which was previously redacted and admitted into evidence. Barnes read as follows from the redacted jail letter:

> My ex-wife not going to go to court against me no more. Plus she's finna change her name and leave the state. Also, my lawyer's on the detective's [expletive] now because on video as soon as I was arrested I was saying "I need a lawyer now," so anything I sa[id] about just going over there picking up my wife and left is void now. You know what that means. Now,

somewhere or another they have to prove I was there on the day of the incident. All I got against me now is a statement from [DeBravo]. I'm trying a little something there, though. He was in the neighborhood on that day. That plus his past of theft and his very detailed description of events, IDK, I'm a dumb-[expletive], but if I can have this brought up in court, I feel like at the very least I could discredit him as a witness against me. I just need his phone records saying his location and hope I'm right. Still, with no other evidence other than a statement from a two-time felon I really feel like I'm live. Hey, can you imagine if by proving [DeBravo] was there on that day, plus his statement and history I got him indicted on cap[ital] murder? Haha, that [expletive] would be super gangster.

Barnes testified that there was no evidence or indication that DeBravo was involved with the three murders. She then stated, "All the evidence I collected pointed straight to [Brownson], that he was the one that committed the murder." On cross-examination, Barnes clarified the gas station video footage previously admitted into evidence would have been recorded before the murders took place.

## E. Forensic Testimony

### 1. Edward Wallace

Firearm Examiner Edward Wallace testified that he "was asked to examine some bullets and shell casings" in relation to Brownson's case. Wallace noted he "did not receive the firearm." He testified that he examined "10 fired cartridge cases . . . and two fired bullets." Wallace concluded the bullets recovered by the medical examiner's office were consistent with 9-millimeter "Smith & Wesson Sigma series semiautomatic pistols." He further testified that "[t]he type of bullet that is loaded in those cartridge cases by the manufacturer when they load the cartridges are jagged hollow point bullets." Wallace testified that the projectiles recovered by the medical examiner "were all fired [from] the same gun."

### 2.    Kimberly Molina

Bexar County Chief Medical Examiner Kimberly Molina testified that she was asked to review the autopsy reports of Rodrigues, Garcia, and Martinez which were conducted in 2016 by Doctor Jennifer Rulon. Molina explained that, according to the reports, Martinez had "four gunshot wounds," including one wound to his "right cheek" and one wound "to the back of the left chest." She further explained that some of Martinez's wounds "showed some evidence of . . . close-range firing" while others "showed no evidence of close-range firing." She further testified that bullets were recovered from Martinez's body and "release[d] back to the investigating law enforcement agency." After the jury was shown photographs from Martinez's autopsy, Molina testified "[t]hat the cause of death was multiple gunshot wounds and the manner of death was homicide." She further testified that a toxicology report conducted on Martinez revealed that he tested positive for "a drug called alprazolam, which is Xanax, and it's metabolite or breakdown product of hydroxy-alprazolam."

Molina next discussed Garcia's autopsy findings. In relation to Garcia, she noted he had three gunshot wounds and "no evidence of close-range firing" as to any of his wounds. One of Garcia's wounds was "to the back of the neck." Similar to Martinez, bullet projectiles were recovered from Garcia's body. Photographs from Garcia's autopsy were presented to the jury. Molina testified that Garcia's "cause of death in this case . . . was multiple gunshot wounds, and the manner of death was homicide." Molina also testified that Garcia tested positive for "alprazolam . . . , as well as ethanol, which is drinking alcohol."

Molina testified that Rodrigues had five gunshot wounds present on his body "in

21

addition to a graze wound." She noted one of his wounds "showed evidence of close-range firing." Photographs from the autopsy were presented to the jury. The State asked Molina whether Rodrigues's injuries were "instant death-type injuries," to which she responded that "in order to say instant death we need very specific injuries, and none of these wounds caused that, so there could have been some survival period after the wounds." Bullet projectiles were recovered from Rodrigues's body as well. Molina stated Rodrigues's manner of death was homicide. A toxicology screening on Rodrigues revealed that he tested positive for "alprazolam . . . and ethanol." As to Rodrigues, Garcia, and Martinez, Molina stated that

> none of these wounds for any of them were necessarily immediately lethal. They could have been, but I couldn't say that any of them necessarily were. It's potential that there was some period of survival, meaning there's— they're breathing, they have a pulse, they have a heartbeat for some time. I wouldn't know how much. So if there was moaning or something of that sorts, that wouldn't be inconsistent.

## F. Verdict and Sentence

The jury found Brownson guilty of capital murder and he was sentenced to imprisonment for life without the possibility of parole in the Texas Department of Criminal Justice Institutional Division. *See id.* §§ 12.31(b)(2), 19.03(a)(7)(A). This appeal ensued.

## II. SUFFICIENCY OF CORROBORATION EVIDENCE

Brownson first challenges the sufficiency of the evidence to corroborate Rebecca's and DeBravo's statements.

## A. Standard of Review and Applicable Law

Texas Code of Criminal Procedure Article 38.14 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other

22

evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14. The accomplice-witness rule "reflects a legislative determination that accomplice testimony implicating another person should be viewed with a measure of caution, because accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Hernandez v. State*, 585 S.W.3d 537, 548–49 (Tex. App.—San Antonio 2019, pet. ref'd) (quoting *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)). Because this rule is statutorily imposed, it "is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards." *Id.* (quoting *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008)).

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'" *Malone*, 253 S.W.3d at 257 (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). "To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id.* (first citing *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); and then citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)). "Rather, the evidence must simply link the accused in some way to the commission of the crime and show that 'rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'" *Id.* (alteration in original) (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)). The non-accomplice witness evidence may be either direct or circumstantial. *See Smith v. State*,

23

332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

"[W]hen there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Id.* (citing *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009)). "Therefore, it is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Id.* (citing *Simmons*, 282 S.W.3d at 509). An appellate court may not offer "alternative, seemingly innocent explanations in certain instances[ that are] in direct opposition to the jury's implicit determination in [the] case." *Id.* (citing *Simmons*, 282 S.W.3d at 508).

Further, in considering the sufficiency of non-accomplice witness evidence, "[t]here is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes; '[e]ach case must be judged on its own facts.'" *Malone*, 253 S.W.3d at 257 (alteration in original) (quoting *Gill*, 873 S.W.2d at 48). The Texas Court of Criminal Appeals has "observed that circumstances that are apparently insignificant may constitute sufficient evidence of corroboration." *Id.* (citing *Trevino*, 991 S.W.2d at 852). Additionally, the court has held "that '[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction.'" *Id.* (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)). However, "mere presence alone of a defendant at the scene of a crime is insufficient to corroborate accomplice testimony." *Id.* (quoting *Golden v. State*, 851 S.W.2d 291, 294 (Tex. Crim. App. 1993)).

"Just as Article 38.14 was enacted to address how to handle accomplice-witness

testimony, Article 38.075 was enacted to similarly address the unreliability of jailhouse-witness testimony." *Phillips v. State*, 463 S.W.3d 59, 67 (Tex. Crim. App. 2015). Article 38.075 provides that

> [a] defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

TEX. CODE CRIM. PROC. art. 38.075(a). "[A] statement that is against a defendant's interest is one that is adverse to his position." *Phillips*, 463 S.W.3d at 68. "Article 38.075 was enacted in recognition that incarcerated individuals have an incentive to provide information against other incarcerated individuals and that this testimony should be corroborated." *Id.* at 66. The standard for corroboration of jailhouse informant testimony under Article 38.075 is the same as the standard for corroboration of accomplice-witness testimony under Article 38.14. *Ruiz v. State*, 358 S.W.3d 676, 680 (Tex. App.—Corpus Christi–Edinburg 2011, no pet.); *see also Phillips*, 463 S.W.3d at 69–71 (Keller, P.J., concurring.) (noting the parallel language of the accomplice-witness statute and the jailhouse informant statute indicates the latter statute was designed to operate like the former). Therefore, the standard for reviewing the sufficiency of non-jailhouse informant evidence under Article 38.075 is as follows:

> When reviewing the sufficiency of non-jailhouse informant evidence under Article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense. The sufficiency of non-jailhouse informant evidence is judged according to the particular facts and circumstances of each case. The direct or circumstantial non-jailhouse informant evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. So when there are conflicting views of the evidence—one that

tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence. Therefore, it is not appropriate for appellate courts to independently construe the non-jailhouse informant evidence. . . . Reviewing courts are required to consider the combined force of all of the non-jailhouse informant evidence that tends to connect the accused to the offense.

*Ruiz*, 358 S.W.3d at 680 (citation modified); *see also Smith*, 332 S.W.3d at 442.

## B.    Analysis

We first note that neither the Texas Court of Criminal Appeals nor the transferor court has expressly ruled that the testimony of an accomplice witness and a jailhouse informant cannot corroborate each other. Therefore, we assume for purposes of this analysis that these two types of witness testimonies cannot corroborate each other. *Ruiz*, 358 S.W.3d at 681 ("To evaluate the sufficiency of corroboration evidence, we must eliminate all of the accomplice/jailhouse-informant testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime."); *see Ruiz v. State*, 631 S.W.3d 841, 853 (Tex. App.—Eastland 2021, pet. ref'd) (eliminating all of the accomplice and jailhouse informant testimony from consideration in conducting a corroboration analysis); *Lee v. State*, No. 12-19-00346-CR, 2021 WL 306203, at *6 (Tex. App.—Tyler Jan. 29, 2021, no pet.) (mem. op., not designated for publication) ("[T]he standard required for corroboration of a jailhouse informant's testimony under Article 38.075 is the same as is required for corroboration of an accomplice-witness's testimony under Article 38.14."); *Lorence v. State*, No. 02-15-00398-CR, 2017 WL 4172077, at *6 (Tex. App.—Fort Worth Sept. 21, 2017, pet. ref'd) (mem. op., not designated for publication) (assuming "accomplice and jailhouse informant testimony cannot corroborate one another").

26

Applying the standards of review articulated above and assuming, without deciding, that accomplice witness and jailhouse informant testimony cannot corroborate one another, we will first eliminate all evidence presented by Rebecca and DeBravo to determine if there is sufficient evidence remaining to connect Brownson to the murders. *See Ruiz*, 631 S.W.3d at 853; *Ruiz*, 358 S.W.3d at 680; *Lee*, 2021 WL 306203, at *6; *Lorence*, 2017 WL 4172077, at *6. When viewed in the light most favorable to the jury's verdict, the corroborating evidence in this case relied upon by the State established the following.

First, Rodriguez-Waton testified that she heard gunshots in another apartment around 7:10 or 7:20 a.m. on September 27, 2016, and saw a man running from that apartment wearing a "sweater with the hoody on top[ and] blue jeans" and that the sweater was "light in color." *See In re C.M.G.*, 905 S.W.2d 56, 59 (Tex. App—Austin 1995, no pet.) (citing *Cooper v. State*, 631 S.W.2d 508, 510 (Tex. Crim. App. 1982) ("Even if the identification were not positive, it need not be positive to provide sufficient corroboration."), *overruled on other grounds by Bell v. State*, 994 S.W.2d 173, 175 (Tex. Crim. App. 1999)). Surveillance video footage from a gas station minutes away from the crime scene depicted Brownson wearing a white hooded sweatshirt and blue jeans shortly before the murders occurred. *See Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996) (explaining that the evidence was sufficient to support the jury's guilty verdict in part when defendant "was seen within a few blocks of the crime scene shortly before and shortly after the murder"). Seiffert and Marlow also confirmed Brownson was at the crime scene at least three days before the murders took place. *See Turner v. State*, 571 S.W.3d 283, 288 (Tex. App.—Texarkana 2019, pet. ref'd) (holding that the evidence tended to connect defendant to the offense when part of the evidence included that the co-

defendants "were seen together by a police officer a few weeks before the" offense).

Further, Molina testified that all three individuals suffered from multiple gunshot wounds. In particular, Martinez had a wound to his "right cheek" and a wound "to the back of the left chest, and Garcia had a wound "to the back of the neck." This testimony corroborated the details provided by DeBravo concerning the location of some of the gunshot wounds. Specifically, DeBravo testified that Brownson stated he shot Martinez in the face, neck, and chest, and that he shot Garcia in the head. S*ee Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005) (holding extraneous offense evidence corroborated the defendant's confessions to the jailhouse informant by detailing the manner in which the crimes were committed with information the jailhouse informant could not have obtained except from defendant himself). Consequently, Molina's testimony also corroborated Rebecca's and DeBravo's statements that Brownson killed all three victims.

Additionally, there was evidence that Brownson had the motive to commit the murders. We note that "[w]hile evidence of motive or opportunity is insufficient alone to corroborate an accomplice witness, it may 'be considered in connection with other evidence tending to connect the accused with the crime.'" *See Castillo v. State*, 517 S.W.3d 363, 377 (Tex. App.—Eastland 2017, pet. ref'd) (quoting *Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1998)). Molina's testimony regarding the autopsy and toxicology findings established that Rodrigues, Garcia, and Martinez all tested positive for alprazolam, otherwise known as Xanax. This testimony corroborated Rebecca's and DeBravo's testimonies that Brownson stated the victims may have put something in Rebecca's drink and sexually assaulted her, as well as DeBravo's specific testimony of Brownson's statement concerning the use of Xanax. This evidence in connection with the

28

other evidence tending to connect Brownson to the murders as previously discussed supports an inference that Brownson had a motive for killing the three victims. *See id.*

Photographs taken at the crime scene later discussed by Barnes established that Rodrigues was laying on top of a blanket, Garcia had a hat underneath his arm, and Martinez was wearing a red tank top. The testimony of Barnes and Wallace also established that hollow point bullets were used in the murders. Wallace further established that a 9-millimeter firearm would have been utilized. Moreover, the exact same details of the victims and their appearance on the day of the murders, the use of hollow point bullets, and the fact that a 9-millimeter firearm would have been used were all consistent with DeBravo's testimony. S*ee Prible*, 175 S.W.3d at 731.

After considering the non-accomplice-witness and non-jailhouse informant testimony, we conclude there is sufficient evidence tending to link Brownson to the commission of the murders. *See* TEX. CODE CRIM. PROC. arts. 38.075(a), 38.14; *Ruiz*, 358 S.W.3d at 680; *Malone*, 253 S.W.3d at 257. Brownson's first issue is overruled.

### III.     ADMISSION OF JAIL LETTER

**A.     Standard of Review and Applicable Law**

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Colone v. State*, 573 S.W.3d 249, 263–64 (Tex. Crim. App. 2019). Unless it is outside the zone of reasonable disagreement, we uphold the trial court's ruling. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). "Furthermore, we will not disturb a trial court's evidentiary ruling, even if the trial court's reasoning was flawed, if it is correct on any theory of law that reasonably finds support in the record and is applicable to that ruling." *Templeton v. State*, 629 S.W.3d 616, 625 (Tex. App.—Eastland 2021, no pet.).

29

**B. Analysis**

**1. Hearsay**

By his second issue, Brownson argues that the trial court erred when it admitted excerpts from a redacted copy of his jail letter because the letter was hearsay without any recognizable exception. The State responds that Brownson's remarks in the disputed letter constitute statements by a party opponent and are not hearsay. We agree with the State.

Hearsay is a written or oral statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(a), (d); *Patterson v. State*, 606 S.W.3d 3, 33 (Tex. App.— Corpus Christi–Edinburg 2020, pet. ref'd). Hearsay is inadmissible evidence unless expressly excepted or excluded from this general rule by statute or the rules of evidence. TEX. R. EVID. 802. Rule 801(e)(2)(A) provides that when a "statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity," it is not hearsay. *Id*. R. 801(e)(2)(A).

To satisfy the admissibility requirements under Rule 801(e)(2)(A), it must be shown that the statement "is the party-opponent's own statement and that it is offered against him." *Templeton*, 629 S.W.3d at 629 (citing *Trevino*, 991 S.W.2d at 853). "Unlike statements against interest" under Rule 803(24), a statement of a party-opponent "need not be against the interests of the party when made in order to be admissible." *Id.* at 629–30 (citing *Trevino*, 991 S.W.2d at 853; *see* TEX. R. EVID. 803(24) (providing an exception to hearsay for certain statements which are "contrary to the declarant's proprietary or pecuniary interest"). "Rather, the admission only needs to be offered as evidence *against*

30

the party who made the admission." *Templeton*, 629 S.W.3d at 630 (citing *Trevino*, 991 S.W.2d at 853).

Here, Brownson's counsel objected to the introduction of his jail letter by stating, "We do not believe it meets the exception to the hearsay rule, specifically where it's an admission against interest under Rule 803(24)." *See* TEX. R. EVID. 803(24). The trial court overruled Brownson's objection and allowed a redacted version of the letter to be admitted.

Regardless of whether the jail letter is admissible under the "statement against interest" exception to hearsay, we find the trial court did not err in admitting the letter. The intercepted jail letter written by Brownson contained his own statements. These statements were offered against Brownson by the State during his capital murder trial. *See Templeton*, 629 S.W.3d at 630. The statements were not hearsay and were, therefore, admissible. *See* TEX. R. EVID. 801(e)(2)(A); *Templeton*, 629 S.W.3d at 629 ("[A] criminal defendant's own statement, when offered against him, is not hearsay and is admissible." (citing *Trevino*, 991 S.W.2d at 853)). Accordingly, the trial court did not abuse its discretion in allowing a portion of the jail letter to be admitted. *See Colone*, 573 S.W.3d at 263–64. Brownson's second issue is overruled.

### 2. Sixth Amendment Violation

We construe Brownson's objection at trial as an argument that the statement in his letter referencing his request for an attorney violated his Sixth Amendment right to counsel. On appeal, Brownson argues the trial court abused its discretion when it admitted the portions of his letter containing: (1) an invocation of his right to counsel, and (2) communications with his counsel concerning "the inadmissibility of [his] admission

31

[that he] picked up Rebecca the day of the murders" and his trial strategy. According to Brownson, admission of these portions violated his Sixth Amendment right to counsel.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. In general, evidence that the defendant invoked the right to counsel is inadmissible as evidence of the defendant's guilt. *Reyes v. State*, 267 S.W.3d 268, 273 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) (citing *Hardie v. State*, 807 S.W.2d 319, 322 (Tex. Crim. App. 1991)). The admission of such evidence in reference constitutes constitutional error. *See id.*

We must perform a harm analysis concerning the admission of evidence based on constitutional error. *See Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001); TEX. R. APP. P. 44.2(a). "Under Rule 44.2(a), a constitutional error subject to harmless error review must be reversed unless the reviewing court determines, beyond a reasonable doubt, that the error did not contribute to the conviction or punishment." *Wells v. State*, 611 S.W.3d 396, 410 (Tex. Crim. App. 2020) (citing TEX. R. APP. P. 44.2(a)). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt." *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007) (first citing *Satterwhite v. Texas*, 486 U.S. 249, 256–57 (1988); and then citing *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)). "Our analysis should not focus on the propriety of the trial's outcome; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence." *Love v. State*, 543 S.W.3d 835, 846 (Tex. Crim. App. 2016) (citing *Wesbrook*, 29 S.W.3d at 119).

"In conducting our review, we must consider the totality of the circumstances by examining the record as a whole." *Malone v. State*, 405 S.W.3d 917, 928 (Tex. App.—Beaumont 2013, pet ref'd) (citing *Miles v. State*, 918 S.W.2d 511, 517 (Tex. Crim. App. 1996)). "We consider such things as the nature of the error, the extent to which it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error." *Love*, 543 S.W.3d at 846 (citing *Snowden v. State*, 353 S.W.3d 815, 821–22 (Tex. Crim. App. 2011)). "This, however, is not an exclusive list of considerations. Instead, we take into account any and every circumstance apparent in the record that logically informs a determination whether, beyond a reasonable doubt, this particular error contributed to the conviction or punishment." *Id.* (citing *Snowden*, 353 S.W.3d at 822). "[T]he presence of overwhelming evidence supporting the finding in question" is relevant to this inquiry. *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002) (quoting *Wesbrook*, 29 S.W.3d at 119)). In addition, "evidence of the defendant's guilt is a factor to be considered in any thorough harm analysis." *Id.* at 358. Therefore, "[t]o judge the likelihood that harm occurred, appellate courts must consider everything in the record . . . ." *Id.*

In his brief, Brownson suggests "[t]he exposure of [his] invocation of his right to counsel . . . left an indelible impression on the jury that [he] was guilty." In *Hardie*, the Texas Criminal Court of Appeals held that "evidence of an accused invoking his or her right to counsel may indeed be construed adversely to a defendant and may improperly be considered as an inference of guilt." 807 S.W.2d at 322. Accordingly, the court held that "evidence of one's invocation of the right to counsel is inadmissible as evidence of guilt." *Id.* Even assuming the trial court erred in admitting the portion of Brownson's letter

33

referencing the fact that he had an attorney pursuant to *Hardie*, we nevertheless conclude beyond a reasonable doubt that the error did not contribute to the conviction for the following reasons. *See Wells*, 611 S.W.3d at 410; TEX. R. APP. P. 44.2(a).

We begin by identifying the nature of the error at issue. "[T]he existence of constitutional error does not in and of itself necessitate characterizing such error as harmful." *Garza v. State*, 828 S.W.2d 432, 436 (Tex. App.—Austin 1992, pet. ref'd). "Violations of the right to counsel that pervade the entire proceeding fall within the category of constitutional violations that, by their very nature, cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Lucas v. State*, 245 S.W.3d 611, 613 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Satterwhite*, 486 U.S. at 256)). Because Brownson's jail letter and invocation was only a small component of the State's case-in-chief, we conclude the violation did not pervade the entire trial and did not cast doubt on the fairness of the trial process. *Lucas*, 245 S.W.3d at 613. We find that the nature of the error weighs in favor of being harmless.

Nor does the record reveal the State heavily relied on or repeatedly emphasized Brownson's invocation. *Love*, 543 S.W.3d at 846. Barnes read the redacted portion of the letter which included Brownson's invocation; however, there were no further questions elicited by the State or testimony surrounding Brownson's invocation. During closing arguments, the State read Brownson's letter virtually verbatim, including the sentence referencing Brownson's invocation. After said reference, the prosecutor stated, "Now, this is normally confidential information, but not if you're writing it to some random third party okay? There goes that." Brownson did not object to the State's comment, nor its recitation

34

of the entire letter. Furthermore, the State made no explicit comment requesting the jury to infer guilt from said invocation, nor repeatedly mention the invocation during its closing arguments. *Cf. Gray v. State*, 986 S.W.2d 814, 815–16 (Tex. App.—Beaumont 1999, no pet.) (finding harm when "[t]he State directly emphasized [defendant]'s invocation of his right to counsel in its closing argument"). This consideration weighs slightly in favor of a finding of harm.

We next look to the probable collateral implications of the error. "This factor requires us to 'contemplate such things as the disparaging of a sole defense,' as well as the probable effect it may have had on punishment." *Hutchison v. State*, 424 S.W.3d 164, 184 (Tex. App.—Texarkana 2014, no pet.) (quoting *Higginbotham v. State*, 807 S.W.2d 732, 737 (Tex. Crim. App. 1991)). In this regard, the collateral implications of Brownson's invocation were negligible. First, the evidence admitted at trial demonstrating Brownson committed the murders, including the testimony of Rebecca and DeBravo, can fairly be described as overwhelming. *See Motilla*, 78 S.W.3d at 357 (finding evidence of a defendant's guilt as well as the presence of overwhelming evidence are factors to be considered in conducting a harm analysis). Second, as noted in his brief, though Brownson's principal defensive theory was that he was not "present at the location and day of the murders," the invocation of his right to counsel in his jail letter did not make this defense any more or less convincing. *See Hutchison*, 424 S.W.3d at 184.

In addition, the error did not affect Brownson's punishment. Prior to the commencement of trial, the State informed the trial court it was not seeking death penalty punishment in this case. Brownson received a life sentence without the possibility of parole following his capital murder conviction—the only punishment available under

35

Texas law. *See* TEX. PENAL CODE § 12.31(b)(2) ("[A] sentence of life imprisonment without parole is mandatory on conviction of the capital felony, if the individual committed the offense when 18 years of age or older."). We find that this consideration weighs against a finding of harm.

It is also important to consider the weight a juror would probably place on the error. In the present case, the trial court overruled Brownson's objection to the letter outside the presence of the jury, and it was later discussed during Barnes's testimony. *Cf. Whitehead v. State*, 437 S.W.3d 547, 553 (Tex. App.—Texarkana 2014, pet. ref'd) (finding that this factor weighed in favor of harm when the trial court admitted evidence over defendant's objections concerning a constitutional right in front of the jury). In addition, this letter was also a relatively small part of the State's evidence and argument, and the jury was unlikely to place undue weight on such letter considering the overwhelming amount of evidence presented in this case linking Brownson to the murders, including his own statements admitting to committing them as presented by Rebecca and DeBravo. *See Motilla*, 78 S.W.3d at 357; *Lemmons v. State*, 75 S.W.3d 513, 521 (Tex. App.—San Antonio 2002, pet. ref'd) (holding constitutional error harmless as it did not contribute to defendant's conviction beyond a reasonable doubt because of the overwhelming evidence of guilt). Furthermore, the vast majority of the testimony and evidence demonstrating Brownson committed the murders was admitted prior to presentment of Brownson's invocation to the jury. We find that this factor weighs against a finding of harm.

Finally, we take into consideration any other circumstance apparent in the record that logically assists in determining whether this particular error contributed to the conviction or punishment beyond a reasonable doubt. *See Love*, 543 S.W.3d at 846.

36

During the jury's deliberations, two jury notes were presented to the parties for review, however, neither of the notes concerned the jail letter or Brownson's invocation of his right to counsel. Accordingly, we find this factor weighs against a finding of harm.

In support of his contentions, Brownson primarily cites *United States v. McDonald*, 620 F.2d 559, 562 (5th Cir. 1980). In *McDonald*, the prosecutor stated during closing argument the following:

> Now, ladies and gentlemen, you know here is you have seen the Secret Service agents, and here is Jimmy McDonald in his house. And here is all this commotion going on around his house, and then three hours later they arrive to serve the search warrant at 5:30 that afternoon. And who was there? The defendant's attorney. And that is when they went in the house to search him, three hours. I suggest to you ladies and gentlemen, I'm not going to tell you what my opinion is, but I suggest to you if Jimmy McDonald knew all this was going on, and had his lawyer out there three hours later, I believe that would be sufficient time to dispose of any ashes or any evidence, if you were so inclined (emphasis ours).

*Id.* The Fifth Circuit held "[c]omments that penalize a defendant for the exercise of his right to counsel and that also strike at the core of his defense cannot be considered harmless error." *Id.* at 564. The court further noted "it is difficult, if not impossible, to sanitize the comments so as to remove the taint." *Id.* We find *McDonald* distinguishable because the prosecutor's comments in that case are not analogous to what occurred in this case. As we already noted, the prosecutor in this case did not explicitly invite the jury to infer guilt from Brownson's invocation, nor can we say that Brownson's invocation "struck at the core" of his defense.

Under the circumstances present here, we are confident beyond a reasonable doubt that any error in admitting Brownson's jail letter concerning the invocation of his right to counsel made no contribution to the jury's determination that Brownson was guilty

37

of capital murder. *See Wells*, 611 S.W.3d at 410. We hold that any error by the trial court in overruling Brownson's objection to the State's reference to his invocation was harmless. *See* TEX. R. APP. P. 44.2(a).

Regarding his complaint on appeal concerning his communication with his counsel contained in his jail letter, we conclude Brownson failed to preserve said complaint. "Even constitutional errors may be waived by failure to object at trial." *Williams v. State*, 402 S.W.3d 425, 437 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995)). While no "magic words" or citation to specific rules is required to preserve a complaint for appeal, a party must convey the substance of the complaint to the trial court clearly "enough to provide the judge and the opposing party an opportunity to address and, if necessary, correct the purported error." *Ex parte Marascio*, 471 S.W.3d 832, 842 (Tex. Crim. App. 2015) (Richardson, J., concurring) (quoting *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011)); *see also* TEX. R. APP. P. 31.1(a).

The record must make it clear that both the trial court and the opposing party understood the legal basis for the complaint. *Thomas v. State*, 408 S.W.3d 877, 884 (Tex. Crim. App. 2013). Further, the complaint on appeal must comport with the specific objection made at trial, or error has not been preserved. *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). Based on the record before us, we conclude Brownson's sub-issue pertaining to communication with his counsel was not preserved for our review because he did not specifically object to that portion of his jail letter on the basis of his Sixth Amendment right to counsel. *See Marascio*, 471 S.W.3d at 842; *Thomas*, 408 S.W.3d at 884; *Thomas*, 505 S.W.3d at 924. We overrule Brownson's third issue.

## IV.   CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
9th day of July, 2026.